IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZHI ZHONG QIU, ) | |
| ) | Case No.   19-cv-2050 |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| ROBERT DIAMOND, JR., and ATLAS ) | **JURY TRIAL DEMANDED** |
| MERCHANT CAPITAL LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff Zhi Zhong Qiu ("Qiu"), by and through his undersigned attorneys, for his Complaint against Defendants Robert Diamond, Jr. ("Diamond") and Atlas Merchant Capital LLC ("Atlas," and together with Diamond, "Defendants") alleges as follows:

NATURE OF THE ACTION

1. Qiu, also known as "ZZ" to his friends and business associates, is a renowned Hong Kong-based businessman with decades of experience in the financial industry in China and the Asia Pacific region.  From 2009 to 2013, he was Vice Chairman for Asia Pacific and Chairman of the Greater China Region at Barclays Capital ("Barclays"), where Diamond was a senior executive until he resigned in 2012.

2. Atlas is a private investment firm, of which Diamond is Founding Partner, Chief Executive Officer, and member of the Investment Committee.

3. This is an action to recover a sum of money that Defendants unambiguously agreed to pay Qiu in exchange for his services in raising investment money for Atlas's fund and its management company.  In 2016, Diamond and Atlas engaged Qiu to help secure an

investment for Atlas from a third-party Chinese investor (the "<u>Investor</u>") whom Qiu introduced to Defendants.

4. Specifically, in January 2016 Defendants and Qiu agreed, as memorialized in a February 2016 e-mail from Diamond, that Defendants would pay Qiu as follows:  If the Investor invested $100 million with Atlas, Qiu would receive $3.5 million upon closing.  If the Investor invested more than $100 million, Defendants agreed to pay Qiu $4.5 million per each additional $100 million in investment (in three equal installments over the course of two years, with one-third to be paid upon investment, one-third paid a year after the investment, and the final third paid two years after the investment).

5. Qiu secured a $200 million investment from the Investor in 2016.  Thus, under the plain terms of the parties' agreement, Defendants were obliged to pay Qiu $5 million immediately upon closing, $1.5 million a year later in 2017, and $1.5 million an additional year later in 2018.  Nonetheless, despite Qiu's repeated requests for payment pursuant to the parties' agreement, Defendants have refused to honor their agreement and have paid Qiu nothing.

<u>PARTIES</u>

6. Plaintiff Qiu is a Hong Kong-based businessperson and investment banker.  He resides in and is a citizen of Hong Kong.

7. Defendant Atlas is a Delaware corporation with its headquarters and principal place of business in New York.

8. Defendant Diamond is Founding Partner, Chief Executive Officer, and member of the Investment Committee of Atlas.  Upon information and belief, Diamond resides in and is a citizen of New York.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Plaintiff Qiu is a citizen of Hong Kong. Defendant Atlas is a citizen of New York and Delaware. Upon information and belief, Defendant Diamond is a citizen of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Defendants because both are citizens of New York, and both reside and conduct business in this District.

11. Venue is proper in this District because this Court has personal jurisdiction over Defendants, and material events concerning the transaction at issue occurred in this District.

## FACTUAL BACKGROUND

**Diamond Asks Qiu For Assistance In Fundraising**
**For His Investment Firm, Atlas Merchant Capital**

12. Diamond, who co-founded the investment firm Atlas in 2013, knew Qiu from when the two worked together at Barclays. Diamond approached Qiu to request his assistance with fundraising for Atlas.

13. In October 2015, Qiu introduced Diamond to the Investor in an in-person meeting in New York to discuss, among other things, a possible investment in Atlas.

14. In the months following the October meeting, Qiu, the Investor, and Diamond continued to discuss the possibility of collaboration between the Investor and Atlas. During these meetings and discussions, the parties discussed the possibility of the Investor investing money in Atlas. Qiu was at the center of these discussions; he frequently corresponded and had meetings and phone calls with the Investor and Atlas employees, offering his advice on the Investor's business strategy and serving as an intermediary between Atlas and the Investor.

15. Diamond continuously pressed Qiu by phone, e-mail, and in person to secure an investment for Atlas from the Investor. For example, on December 23, 2015, Diamond wrote Qiu:

> I truly appreciate all the help you have given us this year working with [the Investor] and helping to put an investment together.
>
> [Atlas partner] David [Schamis] and [Atlas Managing Director] Patrick [Durkin] have briefed me on their meetings with you and later with [the Investor]. I share your opinion that the first thing we should work on is completing an investment in our fund, as it is already in operation and a great way to get to know each other better. From there we can then work on investing in and building other businesses directly with [the Investor]. Your help in achieving this will be greatly valued.
>
> I will likely be in Hong Kong on January 6th and would very much like to meet if you are available.

16. Qiu arranged a meeting between Diamond and the Investor in Hong Kong on or around January 5, 2016. In the course of arranging the meeting, Qiu served as a critical intermediary between Atlas and the Investor. For example, Atlas Managing Director Patrick Durkin e-mailed Qiu on December 28, 2015: "[D]o you think that with Bob [Diamond] spending some time with [the Investor] he can get him to make an investment $50-100mm say in the fund to get the partnership started?" Qiu related the message to the Investor and discussed the matter with Durkin. Similarly, Diamond reached out to Qiu for advice on the meeting with the Investor, writing on December 30, 2015: "What is your advice on my 1 to 1 meeting with him? Ask for fund commitment of say 100 [million?] Ask him to be a special partner, with bigger commitment?" Diamond expressed his thanks for Qiu's advice—that the Investor prized "frank" discussion.

Defendants Engage Qiu To Fundraise For Atlas,
and Defendants and Qiu Form an Agreement

17. Through the beginning of 2016, Qiu and Defendants continued to discuss the possibility of an investment by the Investor in Atlas. Diamond met with Qiu in person several

4

times at the Davos Economics Forum, which took place January 20-23, 2016. At these meetings and in phone calls around the same time, Diamond urged Qiu to agree to be engaged as Diamond's fundraising consultant and advisor to help secure the Investor's investment in Atlas.

18. In these conversations in person and by phone, Qiu and Diamond negotiated an agreement, including exchanging terms. On or about February 9, 2016, Qiu and Diamond came to an agreement (the "Agreement"): Qiu would be paid for his work in proportion to the amount the Investor invested. Thus, if the Investor invested $100 million with Atlas, Qiu would receive $3.5 million upon investment. If the Investor invested more than $100 million, Defendants agreed to pay Qiu $4.5 million per each additional $100 million in investment (in three equal installments over the course of two years, with one-third to be paid upon investment, one-third paid a year after the investment, and the final third paid two years after the investment).

19. Qiu asked Diamond for a written memorialization of the terms. On February 10, 2016, Diamond e-mailed Qiu the memorialized terms of the Agreement:

> ZZ,
>
> thanks for working with us!
>
> I know I can count on you.
>
> I want to confirm my discussion with you regarding the terms of our proposed consulting arrangement and strategic partnership with [the Investor].
>
> [The Investor] will invest $100 million into Atlas, $90 million in the fund and $10 million in the management company. This will form the basis of our partnership and strategic relationship.
>
> We will document a strategic and comprehensive consulting agreement for you, and Atlas will pay $3.5 million for your services upon completion and in accordance with all applicable rules.
>
> We will also pay $4.5 million per $100 million additional funding. Our expectation is that you could deliver an additional 2 to 3 $100 million investments. In this case, we will pay 1/3 at close, 1/3 at end of year 1, and 1/3 at end of year 2.
>
> This is important ZZ, I know I can count on you my friend.
>
> Bob

Due To Qiu's Critical Efforts, the Investor Invests $200 Million In Atlas

20. Fulfilling the terms of the Agreement, Qiu performed critical work to advise Diamond and Atlas in their negotiations with the Investor. Qiu spent untold hours and expended extensive efforts in strategy sessions with Atlas employees and traveled frequently to New York and throughout China on Defendants' behalf. Qiu, who had a longstanding relationship with the Investor and enjoyed his trust, also served as an indispensable intermediary between Defendants and the Investor.

21. Following the formation of the Agreement, Qiu met repeatedly with the Investor to negotiate the terms of his investment with Atlas. Defendants understood that Qiu played a necessary role in the negotiations with the Investor. On January 27, 2016, Durkin sent talking points to Qiu for a meeting with the Investor, adding, "We cannot get this done without you and are here to provide every resource you need to get this completed." Similarly, on January 29, 2016, Diamond wrote to Qiu: "Good luck in your discussions with [the Investor], I know you will get this done!! . . . I am counting on you my friend. Lets get this done and there is so much more for us together."

22. Qiu also offered critical insight as Defendants drafted an agreement with the Investor. For example, in March 2016, Defendants solicited Qiu's feedback on a draft proposed agreement with the Investor. Qiu informed Defendants that a provision calling for the Investor's interest in Atlas to be "passive," with no involvement "in the management or day-to-day activities of" Atlas, would be ill-received by the Investor. Qiu informed Defendants that the Investor "is in the belief that Bob [Diamond] wants him to be a business partner. I believe that [the Investor] would demand that his 5% in the management company enjoy 5% of the same rights as other shareholders."

6

23. Defendants revised the proposed letter agreement to incorporate Qiu's advice. They deleted the "passive interest" provision and inserted a provision ensuring that the Investor would serve as a member of Atlas's Advisory Board and have the right to designate a representative to serve as a member of the Limited Partner committee of Atlas Merchant Capital Fund LP (the investment fund).

24. At the request of Defendants, Qiu also reviewed various transaction documents and delivered them to the Investor for consideration.

25. On April 26, 2016, Diamond wrote to Qiu because his "[l]awyers [are] asking us for disclosure on [Qiu's] fees." Qiu agreed in writing to provide whatever information Diamond needed for regulatory or other disclosure purposes.

26. On May 18, 2016, Qiu proposed a meeting with Diamond in New York. Diamond responded: "Let's hope we have signed and can celebrate!!" At the meeting, Diamond thanked Qiu for his excellent work pursuant to the Agreement. He also told Qiu that he wished to engage him more broadly as an advisor to raise investments in Asia after the deal with the Investor successfully closed. Diamond repeated the same offer to engage Qiu as an advisor in Asia in an in-person meeting in New York on May 31, 2016.

27. In the summer of 2016, owing to Qiu's extensive efforts to bring the Investor to Atlas, as well as his role as an intermediary and advisor, the Investor invested $200 million in Atlas (via an investment vehicle). In light of the Investor's investment of $200 million, and pursuant to the Agreement, Qiu earned a fee of $8 million, to be paid on the schedule set forth in the Agreement.

Defendants Obfuscate, Confuse, And Mislead Qiu
<u>Into Expecting That The $8 Million Would Be Paid</u>

28. The Investor's investment occurred in the summer of 2016. Thus, under the plain terms of the Agreement, Defendants were obliged to pay Qiu $5 million immediately upon closing (in the summer of 2016), $1.5 million in the summer of 2017, and $1.5 million in the summer of 2018. All those dates have passed, and Defendants have paid Qiu nothing, despite numerous demands.

29. Rather than engage with Qiu in good faith and perform their obligations under the Agreement, however, Defendants engaged in a prolonged strategy spanning nearly a year to avoid payment by means of delay and obfuscation. All while promising to pay Qiu, Defendants dangled Qiu offers of meetings to resolve his payment that never materialized, sent Qiu terms for a second agreement that they never followed up on, failed to reply to communications and claimed scheduling difficulties, and otherwise offered baseless and shifting excuses for their inaction.

30. In particular, well after the Investor invested $200 million with Atlas, Diamond repeatedly promised Qiu that he would honor their agreement and pay Qiu. Thus, in a June 30, 2016 meeting with Diamond in New York, Qiu asked Diamond for his compensation, pursuant to the Agreement. Diamond agreed that he would "take care" of Qiu and compensate him. And in a July 21, 2016 meeting with Diamond in New York, Diamond said repeatedly that he was "committed" to paying Qiu pursuant to the Agreement and told Qiu that he wanted to engage him as a consultant more broadly.

31. Qiu sent Diamond a number of texts seeking payment of the $8 million upon which the parties had agreed. For example, on August 25, 2016, he texted Diamond: "Any progress on what we agreed? Do we need another call?"

32.     In the fall of 2016, Diamond promised Qiu that Tim Kacani, then the Chief Financial Officer of Atlas, would contact Qiu to resolve the payment. When Qiu protested to Diamond on October 2, 2016 that he "did not hear from Tim early last week as you said and I expected," Diamond promised on October 3, 2016 that Kacani "will get [back to] you this week."

33.     Though there were certain discrete emails between Kacani and Qiu (related to Kacani claiming he was trying to document the Agreement in a more formal way), Kacani made no substantive attempt to follow through. Thus, as the weeks passed, Qiu texted Diamond on October 27, 2016: "I still have not seen anything from Tim [Kacani] except some legal terms he sent me two weeks ago with no commercial terms at all. Are we still working on the solution?"

34.     On October 28, 2016, Diamond wrote to Qiu: "ZZ. Tim [Kacani] is making good progress. Waiting for a few answers from PW [Atlas's lawyers]. Tim will reach out early next week."

35.     Notwithstanding Diamond's promises, the agreed payment never materialized. Kacani, Diamond, and other Atlas employees became increasingly evasive, proposing meetings with Qiu and then failing to respond to e-mails and claiming scheduling difficulties.

36.     When Diamond did respond to Qiu's communications, he sought to delay and obfuscate, though never disputed the Agreement and that Defendants would pay Qiu as agreed. On November 24, 2016, after Qiu texted Diamond the previous day that he was "very disappointed with the way [he is] being treated," Diamond responded: "Don't be. We are all working like crazy. Will be in China first week of Dec. hang in buddy."

37.     As Defendants' pattern of obfuscation, sowing confusion, and delay continued, Qiu's text messages grew more direct. For example, Qiu texted Diamond on December 3, 2016,

stating, "I think it is the time for the agreed compensation to be settled." On December 31, 2016, Qiu texted Diamond:

> I trusted you fully and worked very hard to advise you on fund raising and made quick delivery. Sadly you did not seem to have kept your promise. You did try to show your commitment to resolve the 'issue', but so far made no move. None of the people you asked to handle this matter made any move. It is now more than clear that the only issue is whether you are willing to keep your promise. Other 'issues', if any, are smartly designed or created by people.... I will never give up protecting my lawful interest.... You told me many times that you were committed to your promise. I hope you will take action and work things out to materialize your promise in 2017.

38. Diamond responded on January 11, 2017, that he "also want[s] to get this resolved and behind us," suggesting a meeting in Hong Kong, and telling Qiu to "[h]ave faith my friend." Nonetheless, despite texts from Qiu asking to schedule the meeting that Diamond proposed, Diamond never responded.

39. In the following weeks, Qiu discovered from the Investor that Diamond planned to meet with the Investor in Beijing on March 2, 2017. At the Investor's invitation and to Diamond's surprise, Qiu attended the meeting between Diamond and the Investor. At the March 2 meeting, Diamond agreed to meet with Qiu the next morning.

40. On March 3, 2017, Diamond still told Qiu that he would honor their agreement to pay him $8 million. However, in a phone call immediately following their meeting, Diamond offered to pay $1 million instead. Qiu rejected Diamond's proposal as a breach of their agreement, and demanded payment of the full $8 million. In text correspondence over the next two days, Diamond said he was "sorry" that Qiu "did not want to continue talking"; Qiu explained, in response, that Diamond's characterization was "not true" and that Diamond had "avoided" him and "prevaricated" over the preceding nine months. Since that exchange, Qiu and Diamond have not corresponded.

41. On January 23, 2019, Qiu's attorneys sent Diamond, via e-mail, a letter demanding "immediate payment, in full, of the $8 million that you agreed to pay [Qiu] for his work, in addition to interest and all other damages Mr. Qiu has suffered as a result of your conduct." As of the date of this filing, Defendants have paid Qiu nothing.

### FIRST CLAIM FOR RELIEF
#### (Breach of Contract)

42. Qiu repeats, realleges, and incorporates by reference the allegations in each of the preceding paragraphs.

43. The Agreement is a valid, existing, and binding contract between Qiu and Defendants.

44. In the Agreement, Defendants agreed to "pay $3.5 million" to Qiu for the first $100 million that the Investor invested with Atlas upon closing of the investment, and "$4.5 million per $100 million additional funding" that the Investor invested with Atlas (in three equal installments over the course of two years, with "1/3 at close, 1/3 at end of year 1, and 1/3 at end of year 2").

45. Defendants' promise to pay Qiu as set forth above is a material term of the Agreement.

46. Qiu is not in breach of the Agreement, and he fully performed his obligations under the Agreement, including by introducing Defendants to the Investor, and providing critical advice and serving as an intermediary during negotiations between Defendants and the Investor.

47. Owing to Qiu's efforts, the Investor invested $200 million with Atlas. Thus, under the terms of the Agreement, Defendants owed Qiu $5 million immediately upon closing of the Investor's investment, $1.5 million one year later, and $1.5 million one additional year after that.

48.     Beginning in the summer of 2016 and through the date of the filing of this Complaint, Qiu has demanded payment of the sum Defendants owe Qiu under the terms of the Agreement.

49.     Defendants breached the Agreement by refusing and failing to pay Qiu the agreed sum of $8 million.

50.     As a result of Defendants' breach, Qiu has suffered damages in an amount to be proven at trial, but not less than $8 million, plus interest at the statutory rate of 9% per annum.

SECOND CLAIM FOR RELIEF<br>(Quantum Meruit)

51.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the preceding paragraphs.

52.     Acting in good faith, Qiu provided Defendants critical services in securing for them a $200 million investment from the Investor, including, but not limited to, introducing Defendants to the Investor, vouching for Defendants as a sound business partner, advising and counseling Defendants on the Investor's business interests and strategy, serving as an intermediary between Defendants and the Investor during negotiations, and helping to ensure the $200 million investment closed.  Qiu provided Defendants the benefits of his decades of expertise and knowledge of the Chinese financial industry, and his relationship with the Investor.

53.     Defendants solicited and accepted Qiu's services as fundraiser, intermediary, and adviser, which resulted in a $200 million investment for Defendants from the Investor, who was introduced to Defendants by Qiu.

54.     Qiu expected compensation for his services, and Defendants expected to compensate Qiu for his services.

55.     The reasonable value of Qiu's services will be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

56. Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the preceding paragraphs.

57. Defendants were enriched by $200 million as a result of Qiu's efforts to secure an investment from the Investor without having paid the normal and ordinary fees paid to persons helping to secure such investments. Defendants would not have obtained the $200 million investment absent Qiu's provision of services, knowledge, and advice.

58. Defendants' enrichment was at the expense of Qiu, who suffered opportunity costs from the loss of time to pursue other business ventures, loss of good will and reputation, loss of the out-of-pocket costs he expended, and loss of the fee that persons such as Qiu normally receive for helping to secure investments, such as the one at issue.

59. Equity and good conscience require Defendants to provide restitution for Qiu's losses, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Qiu respectfully request that a judgment be awarded in his favor and against Diamond and Atlas as follows:

A. For an award of money damages in a sum to be determined at trial, but not less than $8 million;

B. For an award of restitution in a sum to be determined at trial;

C. For costs;

D. For prejudgment interest at the maximum legal rate; and

E. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Zhi Zhong Qiu hereby demands a trial by jury as to all issues so triable.

Dated: New York, New York
March 6, 2019

HOLWELL SHUSTER & GOLDBERG LLP

By: _____
Daniel P. Goldberg (dgoldberg@hsgllp.com)
Gregory Dubinsky (gdubinsky@hsgllp.com)
Laura Aronsson (laronsson@hsgllp.com)
425 Lexington Avenue
New York, New York 10017
(646) 837-5151 (tel)

Counsel for Plaintiff Zhi Zhong Qiu