UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZHI ZHONG QIU,

       Plaintiff,

  – against –

ROBERT DIAMOND, JR., and ATLAS
MERCHANT CAPITAL LLC,

       Defendants.

**OPINION AND ORDER**
19 Civ 2050 (ER)

Ramos, D.J.:

  In 2016, the Defendant Atlas Merchant Capital LLC ("Atlas") secured an investment of $200 million from an undisclosed Chinese investor (the "Investor"). According to the Plaintiff, Zhi Zhong Qiu ("Qiu"), that investment was the direct result of his efforts as a broker in the deal, for which he claims Atlas agreed to pay him $8 million. In March 2019, after nearly three years of seeking compensation to no avail, Qiu initiated this action for breach of contract, unjust enrichment, and *quantum meruit*. Before the Court is Atlas's motion to dismiss the action on the grounds that Qiu's claims are barred by the New York Statute of Frauds and contradicted by the record. For the reasons laid out below, Atlas's motion is DENIED.

**I. BACKGROUND**

  Robert Diamond, Jr. ("Diamond") co-founded Atlas, a New York-based investment firm, in 2013. Pl.'s Mem. Opp'n Mot. Dismiss 2, Doc. 39 (hereinafter "Pl.'s Mem."). At the time, Diamond knew Qiu—a businessman operating in Hong Kong—from a previous period of working together. *Id.*; Compl. ¶ 12, Doc. 1. Diamond allegedly asked Qiu to help him raise funds for Atlas, and in October 2015, Qiu introduced Diamond to the Investor while at a dinner in New York, where the three discussed the Investor's possible investment in Atlas. Compl. ¶

12–13. Qiu continued to facilitate discussions between the three of them over the following months, and Diamond repeatedly consulted Qiu about a strategy for securing the investment from the Investor. *Id.* ¶¶ 14–16. On January 5, 2016, at Diamond's request, Qiu arranged a meeting in Hong Kong between the three. *Id.* ¶ 16.

Approximately one month later, during a phone call on February 9, 2016, Diamond and Qiu allegedly agreed to a consulting arrangement that included, *inter alia*, a series of payments to Qiu dependent upon his ability to secure investments of predetermined amounts from the Investor. *Id.* ¶ 18. According to Qiu, he asked Diamond for some form of documentation memorializing the agreement, and on February 10, 2016, Diamond sent Qiu the following email with the subject line "Fwd: Our Agreement" and his signature block at the bottom:

> ZZ,
>
> thanks [sic] for working with us!
> I know I can count on you.
>
> I want to confirm my discussion with you regarding the terms of our proposed consulting arrangement and strategic partnership with [the Investor].
>
> [The Investor] will invest $100 million into Atlas, $90 million in the fund and $10 million in the management company. This will form the basis of our partnership and strategic relationship.
>
> We will document a strategic and comprehensive consulting agreement for you, and Atlas will pay $3.5 million for your services upon completion and in accordance with all applicable rules.
>
> We will also pay $4.5 million per $100 million additional funding. Our expectation is that you could deliver an additional 2 to 3 $100 million investments. In this case, we will pay 1/3 at close, 1/3 at end of year 1, and 1/3 at end of year 2.
>
> This is important ZZ, I know I can count on you my friend.
>
> Bob

*Id.* ¶ 18–19; Aronsson Decl. Doc. 40, Ex. 1 (hereinafter the "Email"). Beyond the Email, however, the parties never produced a more formal written contract.

After receiving the Email, Qiu continued to negotiate with the Investor and provide advice to Diamond, all of which he believed to be in furtherance of the alleged agreement. Compl. ¶¶ 20–26. Qiu claims that, as a part of that work, he reviewed a draft of Atlas's proposed agreement with the Investor in March 2016 and advised them to replace the "passive" investment provision with a term that would provide the Investor some form of management role. *Id.* ¶ 22. Pointing to a draft letter agreement purportedly authored by Atlas and revised thereby on March 4, 2016, Qiu suggests that Atlas incorporated his advice by deleting the "Passive Interest" provision from the draft and adding language that would provide the Investor a place on the Advisory Board of the company. Aronsson Decl. Doc. 40, Ex. 2; Compl. ¶ 23 (hereinafter "March Letter Agreement").[1]

By Qiu's account, those efforts paid off in the summer of 2016 when he secured a $200 million investment in Atlas from the Investor. *Id.* ¶ 27. Relying on the Email, Qiu alleges that he is entitled to $8 million in fees to be paid in three installments between 2016 and 2018. *Id.* ¶¶ 27–28. Those payment dates have long passed, and despite Qiu's attempts to resolve the situation, he has not received any payment. Compl. ¶¶ 28-41. Consequently, Qiu filed this action for breach of contract, unjust enrichment, and *quantum meruit* on March 6, 2019. Atlas subsequently filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging that Qiu is not entitled to any payment because: (1) in the absence of a formal written agreement,

---

[1] Atlas references a different draft letter agreement dated June 23, 2016. Def.'s Mem. 16; Wilson Decl. Doc. 36, Ex. A (hereinafter "June Letter Agreement"). That document, which is addressed to Atlas Merchant Capital Holdings and is purportedly signed by the Investor, represents that "[n]o broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement." *Id.* ¶ 12. Qiu's complaint makes no direct reference to this second document, and although Atlas contends that he references it indirectly, Def.'s Mem. 16–18, Qiu denies having any knowledge of the document. Pl.'s Mem. 2.

3

Qiu fails to satisfy the Statute of Frauds, and (2) the record contradicts his assertion that he is entitled to payment. Def.'s Mem. Supp. Mot. Dismiss 1–2, Doc. 35 (hereinafter "Def.'s Mem.").

## II. LEGAL STANDARDS

### A. Motion to Dismiss

When assessing a motion to dismiss under Rule 12(b)(6), all allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court's limited task in deciding the motion is to determine whether the complaint is legally sufficient, not whether it is likely to be meritorious. *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 357 (S.D.N.Y. 2018) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). If the complaint provides "enough facts to state a claim to relief that is plausible on its face," then it should not be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Facial plausibility is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When determining whether that standard has been met, the Court may consider the complaint itself, as well as all documents attached thereto or incorporated therein. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *Foros Advisors LLC*, 333 F. Supp. 3d at 357. A document is incorporated when it is referenced in the complaint or when its terms and effects are relied upon heavily such that it may be considered "integral" to the pleadings. *Chambers*, 282 F.3d at 152–53 (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019) (assessing when a document is "integral").

**B. Statute of Frauds**

New York's Statute of Frauds, in relevant part, provides that a "contract to pay compensation for services rendered in negotiating . . . the purchase, sale, exchange, renting or leasing . . . of a business opportunity, business, its good will, inventory, fixtures or an interest therein . . ." is "void, unless it or some note or memorandum thereof be in writing . . . ." N.Y. Gen. Oblig. Law § 5-701(a)(10) (McKinney 2002).[2] By its terms, this provision also extends to "contract[s] implied in fact or in law to pay reasonable compensation," *id.*, ensuring that if a claimant's contract claims for finders' or brokers' fees are barred by § 5-701(a)(10), they cannot attempt to sidestep that result by proceeding under a quasi-contract theory. *See, e.g.*, *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010) (collecting cases).

Where, as here, no formal written contract exists, the Statute of Frauds may still be satisfied by an adequate written "note or memorandum" of the agreement. § 5-701(a). Courts interpreting that provision have imposed four threshold requirements on adequacy. In short, the writing must, on its face: (1) be subscribed to by the party charged; (2) designate the parties to the agreement; (3) identify and describe the subject matter; and (4) establish, either expressly or by reasonable implication, all the essential terms of the agreement. *E.g.*, *Ginsberg Mach. Co. v. J & H Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965); *Antares Mgmt. LLC v. Galt Global Capital, Inc.*, No. 12 Civ. 6075 (TPG), 2013 WL 1209799, at *9 (S.D.N.Y. March 22, 2013); *see also Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575 (1969); *Dahan v. Weiss*, 120 A.D.3d 540, 541 (N.Y. App. Div. 2d Dept. 2014) (collecting cases).

---

[2] The parties neither dispute the applicability of New York law nor object to § 5-701(a)(10) as the appropriate Statute of Frauds provision. Def.'s Mem. 7 n.2.

5

## III. DISCUSSION

It is worth noting, at the outset, that Qiu cites to § 5-701(b)(4) to support his proposition that email messages may constitute writings for Statute of Frauds purposes where the name of the party charged is typed at the end of the email. It is unclear whether that provision, which by its terms is made applicable to the subdivision concerning qualified financial contracts, is applicable to the agreement at bar, which involves a brokerage fee agreement. § 5-701(b)(4) ("For the purposes of *this* subdivision . . . ." (emphasis added)); *but see Trueforge Glob. Mach. Corp. v. Viraj Grp.*, 84 A.D.3d 938 (N.Y. App. Div. 2d Dept. 2011) (applying § 5-701(b)(4) to emails offered to satisfy § 5-701(a)(10)). In any event, this Court has previously treated emails as potentially adequate writings under the brokers' fee provision of the Statute of Frauds without reference to § 701(b)(4). *See Antares Mgmt. LLC*, 2013 WL 1209799, at *10 (finding that "email communications . . . clearly establish[ed] adequate terms of a contract for purposes of satisfying [§ 701(a)(10)]"); *Vioni v. Am. Capital Strategies Ltd*, No. 08 Civ. 2950 (PAC), 2009 WL 174937, at *3 (S.D.N.Y. Jan. 23, 2009) (considering the adequacy of an email under § 701(a)(10) but finding that it lacked essential terms); *Chardan Capital Markets, LLC*, No. 17 Civ. 4727 (PKC), 2018 WL 3733948, at *5 (S.D.N.Y. August 6, 2018) (same). Moreover, New York courts have found emails to be sufficient written memoranda in other Statute of Frauds contexts. *See, e.g.*, *Naldi v. Grunberg*, 80 A.D.3d 1, 3 (N.Y. App. Div. 1st Dept. 2010) (rejecting an argument that emails are per se inadequate and "reaffirming our prior decisions that have held . . . an email will satisfy the statute of frauds so long as it[] . . . meet[s] all requirements of the governing statute."); *Newmark & Co. Real Estate Inc. v. 2615 E. 17 St. Realty LLC*, 80 A.D.3d 476, 477 (N.Y. App. Div. 1st Dept. 2011) (treating an email as a writing under the Statute of Frauds).

Here, Atlas does not dispute that the first three requirements of the Statute are met. Namely, the Email is subscribed to by the party charged—here Diamond—as it was sent from his company email, it included both a typed and automatically generated signature bearing his name, and the Defendants have not disputed its authorship. *See Parma Tile Mosaic & Marble Co. v. Short*, 87 N.Y.2d 524, 527 (1996) (recognizing that "a signature for Statute of Frauds purposes may be 'a name, written or printed . . .'" so long as it was included with an apparent intent to authenticate the writing); *Newmark & Co. Real Estate, Inc.*, 80 A.D.3d at 476 ("An e-mail *sent by a party, under which the sending party's name is typed*, can constitute a writing for purposes of the statute of frauds." (emphasis added)). Moreover, the Email expressly designates the parties to the agreement—Atlas and Qiu—and establishes as its subject matter an agreement between those parties involving the solicitation of funds from the Investor, thereby satisfying the second and third requirements.

Atlas argues that Qiu's claim fails under the Statute of Frauds on the fourth requirement. Specifically, Atlas argues that the Email is inadequate because it fails to state the essential terms of the agreement and includes tentative language suggesting that no agreement had yet been reached. Second, Atlas argues that because Qiu's contract claim is barred by the Statute of Frauds, so too are his quasi-contract claims. Third, Atlas claims that the June Letter Agreement contradicts Qiu's alleged entitlement to compensation, providing an independent basis for dismissal. After reasonably construing all facts and uncertainties in Qiu's favor, as is required, *e.g.*, *McCarthy*, 482 F.3d at 191, the Court is left unconvinced on all counts. Because the Email, when properly understood, constitutes an adequate written memorandum, and because the Court cannot consider the June letter agreement at this stage, Atlas's motion is DENIED.

7

**A. Contract Claims**

1. Essential Terms

Atlas first objects to the adequacy of the Email on the grounds that it "plainly lack[s] essential terms." Def.'s Mem. 12. In relevant part, the Email states: "Atlas will pay $3.5 million for your services upon completion and in accordance with all applicable rules." According to Atlas, the Court is unable to construe the meaning of the terms "services" or "applicable rules" without reference to extrinsic evidence. Def.'s Mem. 12–14. That argument misapprehends the degree of certainty and specificity with which the writing must establish the essential terms.

The primary function of the Statute of Frauds is an evidentiary one; it is intended to "guard against the peril of perjury" and "prevent the enforcement of unfounded fraudulent claims" by limiting the range of evidence permitted to prove the existence of an agreement that lacks a formal writing. *Springwell Corp. v. Falcon Drilling Co.*, 16 F. Supp. 2d 300, 304 (S.D.N.Y. 1998) (quoting *Morris Cohon & Co*, 23 N.Y.2d at 574); *William J. Jenack Estate Appraisers and Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 476 (2013) (same). Moreover, the provision of the New York Statute of Frauds applicable here is motivated by concerns specific to the brokers' fee context:

> Section [5-701(a)(10)] serves to prevent intermediaries . . . from making false or exaggerated claims regarding their fees or commissions. It protects principals from unfounded and multiple claims for commissions, and [it] ensures that controversies over entitlement to a commission are not resolved by juries on conflicting testimony [alone], with the consequent danger of erroneous verdicts.

*Chardan Capital Markets, LLC*, 2018 WL 3733948, at *3 (internal quotation marks and citations omitted).

Those goals are furthered by the adequacy requirements outlined above, all of which limit the ability of claimants to bring spurious contract claims. In applying those requirements,

8

however, courts must be careful not to create "a means of avoiding just obligations" or "a cloak of immunity to hedging litigants lacking integrity." *Morris Cohon & Co.*, 23 N.Y.2d at 574. To those ends, courts have only required that writings set out the essential terms with a "reasonable degree of certainty," *O'Hanlon v. Renwick*, 166 A.D.3d 890, 891 (N.Y. App. Div. 2d Dept. 2018) (citing *In re Litica*, 76 A.D.3d 1076, 1077 (N.Y. App. Div. 2d Dept. 2010)), and have allowed that they do so either expressly or by reasonable implication, *see, e.g.*, *Antares Mgmt. LLC*, 2013 WL 1209799, at *9 (citing *Morris Cohon & Co.*, 23 N.Y.2d at 575).

Moreover, courts have long recognized that adequate writings themselves "[do] not constitute the agreement" but instead are "merely evidence of it." *Condo v. Mulcahy*, 88 A.D.2d 497, 500 (N.Y. App. Div. 2d Dept. 1982) (citing *Abady v. Interco Inc.*, 76 A.D.2d 466, 476 (N.Y. App. Div. 1st Dept. 1980)). Writings may thus serve their function by merely describing, rather than completely formulating, the essential terms and conditions of the agreement. *See Abady*, 76 A.D.2d at 475.

With that understanding in mind, the Court turns first to the use of the term "services" in the Email. Qiu asserts that, "when read as a whole, [the Email] makes plain" what his "services" entail. Pl.'s Mem. 14 (internal citations omitted). The Court agrees, as a reasonable construction of the language in the Email leaves little room for doubt that "services" refers to Qiu's role in securing an investment for Atlas from the Investor, the scope of which is established with the requisite degree of certainty and specificity.

This Court's inquiry starts and ends with the language of the Email itself, which sets out, *inter alia*, a payment structure between Atlas and Qiu:

> Atlas will pay $3.5 million for your *services* upon completion . . . . We will also pay $4.5 million per $100 million *additional funding*. Our expectation is that you could deliver an *additional* 2 to 3 $100 million investments. In this case, we will pay 1/3 at close, 1/3 at end of year 1, and 1/3 at end of year 2. (Emphases added).

9

In essence, the deal entails multiple potential payments to Qiu, which are conditioned upon performance of his service; *i.e.*, "to deliver an additional 2 to 3 $100 million investments." With respect to the latter payments, the Email explicitly states that Qiu's compensation is tied to his ability to raise *additional funds* for Atlas, which suggests that the "services" giving rise to the initial $3.5 million payment are also related to fundraising. The Court need not look beyond the Email to ascertain that the initial round of fundraising was related to an investment by the Investor of "$100 million into Atlas, $90 million in the fund and $10 million in the management company."

The Email clearly establishes, then, that Qiu would be paid $3.5 million for securing an initial investment of $100 million for Atlas, and he would be paid an additional $4.5 million for each additional $100 million investment that he could secure from the Investor. While Atlas is undoubtedly correct that "services" is an essential term of the agreement, the Statute of Frauds and the decisions interpreting it hardly require that the court be able to discern a more nuanced understanding of that term than what is laid out here. *Compare Antares Mgmt. LLC*, 2013 WL 1209799, at *10 (finding adequate, under §701(10), emails "invit[ing] plaintiffs to help find an investor for 'the fund,'" expressing what size investment was needed, and stating that they were "prepared to split the fund fees at 50%"), *with Foros Advisors LLC*, 333 F. Supp. 3d at 364 (finding inadequate, under § 701(a)(10), a letter that "[did] not include a price term" or an explanation of the "role [the plaintiff] would play in the transaction . . . "), *and Chardan Capital Markets, LLC*, 2018 WL 3733948, at *5 (finding inadequate, under § 701(a)(10) an email that "[did] not indicate what services [defendant] believed required payment").

Atlas also takes issue with the phrase "applicable rules," as used in the Email, which states that "Atlas will pay [Qiu] $3.5 million for [his] services upon completion and in

10

accordance with all applicable rules." They suggest that the language identifies some set of rules or terms that are essential to the agreement without "giv[ing] any indication of what those rules might be." Def.'s Mem. 13–14. The Court finds little basis for that claim.

First, as Atlas notes, the language can clearly be read as a statement that the parties must abide by the laws and regulations applicable to them when performing the terms of the contract. Def.'s Mem. 13 n.4 (suggesting that "all applicable rules" could refer to compliance with broker registration requirements and U.S. securities laws). Because parties are, at all times, obligated to act in accordance with the law, the inclusion of a requirement that they do so here in no way "affects [their] rights and obligations," in which case the language does not constitute an essential term subject to scrutiny under the Statute of Frauds. *Hadami v. Xerox Corp.*, 272 F. Supp. 3d 587, 597 (S.D.N.Y. 2017) (quoting *Ginsberg Mach. Co.*, 341 F.2d at 828); *see also Miller v. Tawil*, 165 F. Supp. 2d 487, 494 (S.D.N.Y. 2001) (defining essential terms as those that "seriously affect[] the rights and obligations of the parties").

Moreover, the Court is satisfied that the core essential terms have been provided for given that, as explained above, the writing clearly establishes how much money Qiu was to be paid in exchange for particular amounts of money raised from the Investor and when Atlas would pay him. *See Manhattan Fuel Co., Inc. v. New England Petroleum Corp*, 422 F. Supp. 797, 801 (S.D.N.Y. 1976) (enforcing an agreement where the writings "identified buyer, seller and broker, and specified the subject matter of the brokerage, the commission payable, and the duration over which commissions were to be paid"); *see also Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 8 Civ. 10578 (RJS), 2010 WL 1257326, at *6 (S.D.N.Y. Mar. 12, 2010) ("While the alleged agreement is hardly . . . a 'model of detail,' the Complaint alleges the

11

existence of a contract with sufficient specificity to withstand a motion to dismiss." (internal citations omitted)).

Thus, even if the above reading of "all applicable rules" is rejected, there is no indication that the phrase references terms distinct from those plainly established by the Email itself or that are otherwise essential in nature. In light of the need to balance between the risk of spurious brokers' claims, *Chardan Capital Markets, LLC*, 2018 WL 3733948, at *3, and the risk of allowing valid obligations to go unenforced, *Morris Cohon & Co.*, 23 N.Y.2d at 574, the Court will not read uncertainty into a writing, the terms of which are otherwise sufficiently clear, *cf. Gen. Elec. Capital Corp. v. Domino's Pizza Inc.*, No. 93 Civ. 5070 (PKL), 1994 WL 256776, at *4 (S.D.N.Y. June 2, 1994) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).

2. Tentative Language and Contemplation of Future Writings

Atlas further argues that both the tentative language employed in the Email, as well as the Email's explicit reference to further documentation of the agreement, render the writing inadequate. Based on the procedural posture and a reasonable reading of the Email, the Court cannot agree.

The first substantive sentence of the Email reads, "I want to confirm my discussion with you regarding the terms of our proposed consulting arrangement and strategic partnership with [the Investor]." Atlas narrowly focuses on the words "discussion" and "proposed," neither of which are used again in the Email, to suggest that what Qiu claims to be a verbal agreement between himself and Diamond was nothing more than a "discussion about a proposed arrangement," the specifics of which would be resolved at some later time. Def.'s Reply Mem.

Supp. Mot. Dismiss 3–5, Doc. 42 (hereinafter "Def.'s Reply"); Def.'s Mem. 11–12. At the outset, the Court finds little significance in Diamond's use of the word "discussion." Qiu himself acknowledges that this was an agreement reached over the phone, *i.e.*, during a discussion, and the surrounding language in the Email makes clear that Diamond was simply referencing that occasion. No further significance can be reasonably inferred from his choice of "discussion" as opposed to "conversation" or any other similar word. *See generally Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 939 F. Supp. 2d 422, 428–29 (S.D.N.Y. 2013) (stressing the role of "common sense" in contract interpretation).

That leaves Diamond's use of "proposed" as the remaining link between the Email and Atlas's preferred interpretation thereof. As used in the sentence referenced above, "proposed" is subject to various interpretations. That offered by Atlas is no more reasonable or compelling than one that construes "our proposed agreement" as merely indicating that it was Diamond who made the initial offer to Qiu. The Court need not resolve that narrow issue, however, because Atlas's interpretation is untenable when placed in the broader context of the Email as a whole.

Atlas, in lodging its argument, conveniently omits the multiple, unambiguous statements in the Email indicating that Diamond and Qiu had, in fact, reached an agreement.[3] Most glaringly, the subject line of the Email states unequivocally, "Our Agreement." Beyond that, Diamond begins the Email by writing, "thanks for working with us! I know I can count on you," and ends it with, "This is important ZZ, I know I can count on you my friend." Whatever the best reading of "proposed" may be when examined strictly within the sentence in which it was used, those additional statements wholly undermine the reasonableness of Atlas's construction of the agreement at large. *See, e.g.*, *Chardan Capital Markets, LLC*, 2018 WL 3733948, at *5

---

[3] It is indeed telling, as Qiu points out, that at no point in its papers do the Defendants quote the entirety of the relatively brief Email.

(interpreting relevant language in the context of the whole writing). In other words, once the language is viewed in the appropriate context, it does not permit the inferences that Atlas would have this Court draw therefrom. *See Gen. Elec. Capital Corp.*, 1994 WL 256776, at *4 (S.D.N.Y. June 2, 1994) (giving "reasonable and effective meaning" to the language in an agreement).

Moreover, to the extent that Atlas suggests Diamond's statement, "We will document a strategic and comprehensive consulting agreement," creates an insurmountable bar under the Statute of Frauds, they are mistaken. It is not the case that the mere "anticipation of executing a more formal contract" impairs the effectiveness of an otherwise adequate writing. *O'Hanlon v. Renwick*, 166 A.D.3d at 891-92 (citing *160 Chambers St. Realty Corp. v. Register of City of N.Y.*, 226 A.D.2d 606, 607 (N.Y. App. Div. 2d Dept. 1996)). Rather, once the parties reach an agreement and "draft a preliminary document that states with sufficient specificity all material elements of the agreement, the Statute of Frauds is satisfied, even if the parties contemplated redrafting that document." *Carruthers v. Flaum*, 450 F. Supp. 2d 288, 309 (S.D.N.Y. 2006) (citing *Tymon v. Linoki*, 16 N.Y.2d 293, 298 (1965)). The case law relied on by both parties suggests two instances in which Diamond's aforementioned statement may have rendered the writing inadequate, neither of which is applicable here.

First, a party's contemplation of future formalization may render an initial writing inadequate where the parties leave certain essential terms undefined and subject to future negotiation and finalization. *See, e.g.*, *Carruthers*, 450 F. Supp. 2d at 308–09 (noting that "[a] preliminary agreement to agree," wherein "the parties have not reached final agreement on the fundamental terms of the deal," does not satisfy the Statute of Frauds (internal quotation marks omitted)); *Rouzani v. Rapp*, 203 A.D.2d 446, 447 (N.Y. App. Div. 2d Dept. 1994) (finding

inadequate an agreement that left essential terms to be decided at a future time). In many instances, this rule poses no additional barrier beyond that of the threshold essential terms requirement. However, where an inference *could* supply the meaning of an essential term, an apparent agreement to define the term at a later time may nonetheless defeat the writing even though the threshold requirement might not. *Rouzani*, 203 A.D.2d at 447 (where "essential terms have been omitted *or* left for future negotiations, the memorandum is insufficient to satisfy the Statute of Frauds" (emphasis added)). That is not the situation before the Court. The essential terms are established with requisite certainty, as explained above, and nothing in the language of the Email amounts to an agreement or intention to define them at some later point in time.

Two cases, both relied on by Atlas, provide useful comparisons. In *Bernat v. West 73d Street Corp.*, the court found insufficient a writing that included the following, "[The cancelation clause,] together with other minor details must be mutually agreed upon by the parties hereto on or before January 10, 1930, or the return of the deposit is hereby authorized, making this contract void." 230 A.D. 18, 19 (N.Y. App. Div. 1st Dept. 1930). Similarly, in *Ramos v. Lido Home Sales Corp.*, a writing was held inadequate because it included the clause, "more formal contracts containing all of the terms and conditions shall be signed." 148 A.D.2d 598, 599 (N.Y. App. Div. 2d Dept. 1989). In both instances, the writings made clear that the parties did not intend to be bound until a final, formal agreement on the terms was reached. Diamond's statement, on the other hand, merely noted that Atlas would document the agreement. That language neither explicitly nor impliedly establishes that the parties were to further specify the meaning of any terms or conditions at some future date, and therefore does not create the type of bar implicated by the statements present in *Bernat* and *Ramos*.

The prospect of future formalization may also impose a bar where there is sufficient evidence of one or both parties' intent not to be bound in the absence thereof. For example, in *R.G. Group., Inc. v. Horn & Hardart Co.*, to which both parties cite, the court explained that "when a party gives *forthright, reasonable signals* that it means to be bound only by a written agreement, courts should not frustrate that intent." 751 F.2d 69, 75 (2d Cir. 1984) (emphasis added); *see also Checkla v. Stone Meadow Homes, Inc.*, 280 A.D.2d 510, 511 (N.Y. App. Div. 2d Dept. 2001) (collecting cases). But, "[o]n the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed," the contemplation of further memorialization does not bar the enforcement of a preliminary agreement, the substantial terms of which have been established. *R.G. Grp., Inc.*, 751 F.2d at 74.

Applied in the Statute of Frauds context, a writing cannot be adequate if it or some other permissible evidence affirmatively indicates that a party or the parties did not intend to be bound in the absence of a formalized writing. No such indication exists here. Notably, Diamond did not call for the parties to draft a "more formal contract[]," *Ramos*, 148 A.D.2d at 599; *see also Tamir v. Greenberg*, 119 A.D.2d 665, 667 (N.Y. App. Div. 2d Dept. 1986) (rejecting a memorandum that "specifically provide[d] for a formal contract to be drawn up by the attorneys for the respective parties within 10 days"), nor did he include language aimed at voiding any preliminary agreement in the absence of future formalization, *see Bernat*, 230 A.D. at 19. Instead, Diamond simply stated, without the use of any conditional language, that Atlas would "document" their agreement with Qiu. That unilateral intent to further memorialize the agreement does not, by itself, invalidate that agreement, regardless of the fact that said memorialization never occurred.

Because Atlas's arguments with respect to (1) the essential terms of the agreement, (2) the "tentative" language in the Email, and (3) the necessity of a more formal contract all fall short, the Court will not dismiss Qiu's contract claims.

**B. Quasi-Contract Claims**

Qiu also makes claims for payment under the quasi-contract theories of unjust enrichment and *quantum meruit*. Atlas does not address whether Qiu's complaint satisfies the core requirements of those claims, instead arguing only that the claims should be dismissed because the Statute of Frauds, in the context of brokers' and finders' fees, applies with equal force to quasi-contracts. Def.'s Mem. 16. Atlas's position is correct in the abstract. *Gutkowski*, 680 F. Supp. 2d at 613 (collecting cases). However, the Court's denial of Atlas's motion with respect to Qiu's contract claims means, at least in light of Atlas's limited argument, that there is no remaining basis for dismissing the quasi-contract claims at this time.

**C. Draft Letter Agreement**

Finally, Atlas argues—as an additional and independent basis for dismissal—that Qiu's claims are foreclosed by the June Letter Agreement, sent to Atlas by the Investor, in which the Investor "expressly represent[s] and warrant[s] that no broker or finder [is] entitled to any fee in connection with the investment." Def.'s Mem. 16; *see also* June Letter Agreement. That agreement was not included in Qiu's complaint and can only be considered at this stage if the complaint incorporates it by reference or reliance. *Chambers v. Time Warner, Inc.*, 282 F.3d at 152–53 (2d Cir. 2002); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d at 72 (per curiam); *Foros Advisors LLC*, 333 F. Supp. 3d at 357. Notwithstanding Atlas's arguments to the contrary, there has been no such incorporation here.

17

In his complaint, Qiu refers to a "proposed letter agreement" and "various transaction documents" that he reviewed in the process of securing the investment for Atlas. Compl. ¶¶ 23–24. Qiu has previously noted that this was not a reference to the June Letter Agreement but instead to the draft March Letter Agreement that he edited in March 2016. Pl.'s Mem. 21 (explaining that Qiu addressed this confusion during the pre-motion process (citing Pl.'s Pre-Motion Letter Doc. 23)). Qiu has since provided a copy of that draft agreement to the Court, which aligns with his complaint's description of the document that he reviewed and thus relied upon in the complaint. *See* March Letter Agreement ¶¶ 3–4. And, in any event, the Court is required to construe uncertainties, including the meaning of the complaint's vague references, in Qiu's favor. *McCarthy*, 482 F.3d at 191. That being the case, the Court does not find that the June Letter Agreement was incorporated into the complaint by way of reference.

Lastly, Atlas's bare assertion that the document was "integral" to the complaint, Def.'s Mem. 16–18; Def.'s Reply 10, is unsupported by the record. A matter is deemed integral to a complaint only when the complaint "relies heavily upon its terms and effects." *Palin*, 940 F.3d at 811. Atlas claims that Qiu did as much, but nothing in the record suggests that the June Letter Agreement was one of the "transaction documents" that Qiu worked on or that Qiu was even aware that said letter agreement ever existed. Lacking any basis for finding that the June Letter Agreement was integrated into the complaint through reference or reliance, the Court declines to consider its effect or the parties' further arguments in relation thereto.

## IV. CONCLUSION

For the reasons set forth above, Atlas's motion to dismiss is DENIED. The parties are directed to appear for a status conference on April 8, 2020 at 10:00 AM. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 34 and 41.[4]

It is SO ORDERED.

Dated: February 27, 2020
New York, New York

Edgardo Ramos, U.S.D.J.

---

[4] Atlas's request for oral argument, Doc. 41, is dismissed as moot.